IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| VERNA CARTER-PERRY, | ) | CASE NO. 1:14CV761 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Verna Carter-Perry ("Carter-Perry") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to the consent of the parties.  Doc. 17.

For the reasons stated below, the Commissioner's decision is **AFFIRMED**.

### I. Procedural History

Carter-Perry protectively filed an application for DIB on July 20, 2010, alleging a disability onset date of March 1, 2010.  Tr. 19, 156, 160.  She alleged disability based on the following: asthma, "copd," and sciatic nerve problem.  Tr. 198.  After denials by the state agency initially (Tr. 76, 80) and on reconsideration (Tr. 96, 93), Carter-Perry requested an administrative hearing.  Tr. 100.  A hearing was held before Administrative Law Judge ("ALJ") C. Howard Prinsloo on October 12, 2012.  Tr. 40-71.  At the hearing, Carter-Perry amended her onset date to June 26, 2011.  Tr. 42.  In his December 19, 2012, decision (Tr. 19-33), the ALJ determined that

there were jobs that existed in significant numbers in the national economy that Carter-Perry could perform, i.e., she was not disabled.  Tr. 31.  Carter-Perry requested review of the ALJ's decision by the Appeals Council (Tr. 15) and, on February 10, 2014, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-4.

## II. Evidence

### A.  Personal and Vocational Evidence

Carter-Perry was born in 1962 and was 48 years old on the date her application was filed. Tr. 193.  She completed eleventh grade.  Tr. 198.  She previously worked as a nursing assistant. Tr. 199.  She last worked in June 2011.  Tr. 242.

### B.  Relevant Medical Evidence

#### 1.  Mental evidence[1]

On September 1, 2009, Carter-Perry saw her family physician James E. Misak, M.D.  Tr. 284.  Carter-Perry reported that, after her father died in July 2009, she felt sad, blue, angry, and had frequent crying spells.  Tr. 284.  Carter-Perry was diagnosed with adjustment disorder with depressed mood.  Tr. 285.  Dr. Midak prescribed Sertraline.  Tr. 285.

On October 16, 2009, Dr. Misak observed that Carter-Perry was "cheerful."  Tr. 277. Carter-Perry reported that she was "much less sad" and that she had stopped taking the Sertraline.  Tr. 277.  Dr. Misak diagnosed her with grief reaction and made no further recommendations for treatment.  Tr. 278.

On December 3, 2010, Carter-Perry told Dr. Misak that her son was killed in November and that since then she was tearful, crying all the time, had a poor appetite, and slept badly.  Tr.

---

[1]  Carter-Perry did not list a mental impairment in her application.  Tr. 198.  She also did not testify that a mental impairment prevented her from working.  Tr. 44; *see also* Tr. 51 (when asked about her mental health, Carter-Perry answered that "it goes and comes" and that she was "okay.").  However, there is evidence in the record regarding a mental impairment and the ALJ considered this purported impairment in his opinion.

437.  She reported that she had good family support and would be seeing a grief counselor.  Tr.

437.  Dr. Misak gave her a low-dose amitriptyline to help her sleep.  Tr. 437.

On January 24, 2011, Carter-Perry reported to Dr. Misak that she was sleeping better on

amitriptyline and wanted to continue it.  Tr. 440.  She still had a poor appetite and stated that she

would not go to her pulmonary appointment the following month because of her son's death.  Tr.

440.

On April 29, 2011, Carter-Perry reported that an individual was arrested in connection

with her son's murder, that she was working with a grief counselor, and that she felt "somewhat

better."  Tr. 563.  Her sleep remained improved and she was eating better and gaining weight.

Tr. 563.

On May 19, 2011, while at the emergency room, Carter-Perry was tearful and expressed

feelings of depression over the death of her son.  Tr. 484.  On January 6, 2012, Carter-Perry

reported to Dr. Misak that the holidays had been difficult for her and that she was attending a

support group, which she found helpful. Tr. 612.

### 2.  Physical evidence

**Lungs:** Carter-Perry has a long history of asthma and chronic obstructive pulmonary

disease (COPD).  On February 10, 2009, Cater-Perry saw pulmonologist Michael Infield, M.D.

Tr. 301.  Dr. Infield noted that Carter-Perry previously had a substernal goiter compressing her

trachea that was removed.  Tr. 301, 307.  He found that she had minimal symptoms and listed her

triggers as heat, cold air, pollen, grass, dust, and exercise.  Tr. 301.  He observed that her COPD

and asthma were well-controlled on Singulair, Spiriva, and Advair with minimal need for a

rescue albuterol inhaler and no prednisone bursts or emergency room visits in over a year.  Tr.

307.

Carter-Perry reported that she quit smoking in May 2007.  Tr. 303.  Upon examination, she had no wheezing or crackles and normal air exchange.  Tr. 307.  Dr. Infield commented that her chief complaint was oral thrush more than dyspnea or wheezing.  Tr. 307.  He recommended decreasing her Advair to stop her thrush and eliminating Spiriva in the spring if her symptoms remained well-controlled.  Tr. 307.

On August 25, 2009, Carter-Perry saw pulmonologist Gaurav Khanna, M.D.  Tr. 288.  She reported using her inhaler three to four times in the last week.  Tr. 288.  She had resumed smoking 3-4 cigarettes per day.  Tr. 288.  She stated that she felt fine.  Tr. 288.  Upon examination, Cater-Perry's lungs were clear.  Tr. 290.  Dr. Khanna diagnosed moderate persistent asthma, tobacco abuse, and COPD with severe emphysema.  Tr. 291.  He recommended that Cater-Perry increase her use of Advair and begin alpha antitrypsin in addition to her regular medication regimen of Singulair, Proventil, Nasonex, and Spiriva.  Tr. 290-291.  He counseled her about the ill effects of smoking and presented options available for cessation but she was not interested.  Tr. 291.

On September 1, 2009, Dr. Misak noted that Carter-Perry was taking her medications as required with the exception of Advair which she could not afford.  Tr. 284.  Carter-Perry denied having shortness of breath or chest pain.  Tr. 284.  Dr. Misak remarked that her asthma was stable.  Tr. 285.   He substituted Symbicort instead of Advair and recommended that she continue her treatment regimen and stop smoking.  Tr. 285.

On September 15, 2009, Carter-Perry underwent a pulmonary function test.  Tr. 280.  She was found to have a moderate obstructive ventilatory impairment that did not respond significantly to bronchodilator therapy.  Tr. 280.

On October 16, 2009, Carter-Perry saw Dr. Misak.  Tr. 277.  Carter-Perry reported that she had not needed to use her albuterol inhaler since she started taking Spiriva.  Tr. 277.  She denied symptoms of shortness of breath or chest pain and her lungs were clear upon exam.  Tr. 277.

On December 8, 2009, Carter-Perry saw Dr. Khanna for a follow-up visit.  Tr. 339.  She stated that she felt fine and denied any nighttime breathing symptoms, although she had used her albuterol every day the previous week.  Tr. 339.  She reported asthma triggers of cold season, change in the weather, perfumes and cologne.  Tr. 339.  She wore an airguard mask during the last cold season with good results.  Tr. 339.  She still smoked three cigarettes a day.  Tr. 339.  Upon examination, Carter-Perry's lungs were clear with no wheezing.  Tr. 341.  Dr. Khanna attributed her increased asthma symptoms to the change in temperature and noted that she is only using one puff of Symbicort a day.  Tr. 342.  He increased it to two and recommended that she continue taking her medications, wear an airguard mask when she goes out, and counseled her on the ills of smoking.  Tr. 342.

On January 22, 2010, Dr. Misak noted that Carter-Perry's asthma was controlled and that her COPD was stable.  Tr. 326, 330.  He continued her on her medications and noted that she had stopped smoking.  Tr. 330.

On March 9, 2010, Carter-Perry went to the emergency room complaining of stabbing chest pain, shortness of breath, and wheezing after having had sneezing, a runny nose, and post-nasal drainage for five days.  Tr. 296.  Chest x-rays showed no significant interval change and no acute infiltrates.  Tr. 315.  In a follow-up appointment with Dr. Misak on March 31, 2010, Carter-Perry reported good results with Flonase and only rare albuterol use.  Tr. 271.

On April 13, 2010, Cater-Perry saw Dr. Khanna for a follow-up visit.  Tr. 267.  She reported using her inhaler only two times per week and she had baseline peak flow meter readings.  Tr. 267.  She complained of wheezing and shortness of breath upon exertion and three nighttime symptoms a week.  Tr. 267.  Dr. Khanna diagnosed moderate persistent asthma, COPD, likely emphysema, and mild pulmonary hypertension.  Tr. 268.  He noted that she was doing fine.  Tr. 268.  He recommended that she wear her mask when she goes out, begin Flovent, and use an air conditioner and humidifier.  Tr. 269.

On July 9, 2010, Carter-Perry reported to Dr. Misak that she still had a lot of trouble breathing, especially in the hot weather.  Tr. 263.  She stated that she was using her albuterol inhaler four to five times a day.  Tr. 263.  Dr. Misak instructed her to increase her Flovent, continue taking her other medication, and keep her upcoming pulmonologist appointment.  Tr. 264.

On July 13, 2010, Carter-Perry saw pulmonologist Rajesh Kandasamy, M.D.  Tr. 258. Carter-Perry reported normal exercise tolerance of 2 blocks of walking and one flight of stairs on a good day.  Tr. 258.  She stated that she had smoked five cigarettes per day for the past seven years and had worked in dusty environments until 2005.  Tr. 258.  She claimed that her symptoms of allergic rhinitis were controlled with Flonase and that she had stopped smoking within the past month.  Tr. 258.  She also reported that her shortness of breath becomes worse when she exerts herself outside.  Tr. 258.  Upon examination, Carter-Perry's breath sounds were good, with no rales or rhonchi.  Tr. 261.  Dr. Kandasamy opined that her COPD was well-controlled and was most likely caused by her past occupational exposure.  Tr. 261.  He recommended continued use of her mask when she performed exertional activities outdoors and

noted that she would be a candidate for pulmonary rehabilitation if her symptoms worsened. Tr. 261.

In October 2010 Carter-Perry participated in a pulmonary rehabilitation treatment program that included exercise for ten to forty minutes three times a week. Tr. 431. On October 25, 2010, she participated in an exercise oximetry study. Tr. 434. The results indicated that, after walking 1,274 feet at a normal pace while breathing room air, Carter-Perry showed no worrisome oxygen desaturation and no supplemental oxygen was recommended. Tr. 434.

On January 24, 2010, Dr. Misak noted that Carter-Perry's asthma symptoms were stable and that she denied shortness of breath or chest pain. Tr. 387. Upon exam, her lungs were clear. Tr. 387.

On February 15, 2011, Carter-Perry saw pulmonologist Dr. Edward Warren, M.D. Tr. 382. Dr. Warren observed that Carter-Perry was on a fairly aggressive treatment regimen for asthma. Tr. 382. On February 16, 2011, Dr. Kandasamy added that Carter-Perry reported reduced exercise tolerance and inhaler use four times a day. Tr. 382-383. She complained of intermittent shortness of breath when outside in cold weather. Tr. 383. Dr. Kandasamy advised she continue her medications and undergo a lung function test. Tr. 385.

A pulmonary function test was performed on February 25, 2011, by Bruce Arthur, M.D. Tr. 375. Carter-Perry displayed no significant change since her September 2009 evaluation. Tr. 375. Dr. Arthur listed a diagnostic impression of fully reversible, mild obstructive ventilatory impairment. Tr. 375. He noted she had gas trapping with hyperinflation on lung volume testing and that her diffusion capacity was reduced out of proportion to the level of obstruction. Tr. 375. He recommended considering concomitant anemia, interstitial or pulmonary vascular disease. Tr. 375. In an exercise oximetry study on the same day, Carter-Perry walked 1300 feet while

breathing room air and maintained a 98% oxygen saturation rate.  Tr. 376.  Dr. Arthur commented that she experienced no significant oxygen desaturations.  Tr. 376.  Carter-Perry also participated in a nocturnal pulse oximetry study that showed no episodic desaturations.  Tr. 380.

On October 7, 2011, Carter-Perry reported to Dr. Misak that she used her albuterol inhaler three times a week.  Tr. 504.  She did not complain of chest pain or shortness of breath.  Tr. 504.  Dr. Misak found that her asthma and COPD symptoms were stable.  Tr. 504.  On January 6, 2012, Dr. Misak noted that she became symptomatic upon exposure to cold and recommended that she avoid cold and continue her medications. Tr. 612, 613.  On May 19, 2011, Dr. Misak remarked that she had no current asthma or COPD symptoms and was stable.  Tr. 680.  On August 10, 2012, Carter-Perry reported increased inhaler use but was stable.  Tr. 696, 698.

On May 8, 2012, Carter-Perry saw pulmonologist Vidya Krishnan, M.D.  Tr. 652.  Dr. Krishnan noted that she had asthma triggered primarily by exercise, and observed that she remained active and that she had stopped smoking.  Tr. 652.  Dr. Kandasamy commented that she had no recent exacerbations and that her asthma and COPD were stable with no progression.  Tr. 653.

**Back:** On May 18, 2011, Carter-Perry presented to the emergency department complaining of sharp right flank and back pain.  Tr. 459, 485.  Upon examination, she displayed exquisite tenderness to palpation over the right paraspinal muscles from the mid-thoracic to her iliac crest region with no asymmetry.  Tr. 485.  The attending physician diagnosed a thoracic back strain and prescribed a Toradol injection for immediate administration and a take-home prescription for Motrin.  Tr. 486.

On June 17, 2011, Carter-Perry complained to Dr. Misak that she continued to have right-sided low back pain that was not relieved by ibuprofen.  Tr. 467.  Dr. Misak found tenderness to

palpation in her right lumbar paraspinal muscles but no muscle spasm.  Tr. 467.  He

recommended that she switch to Naproxen to treat her lumbar osteoarthritis.  Tr. 468.  The

treatment notes indicate that an MRI study from 2007 revealed moderate facet disease at L5-S1

without significant canal or foraminal narrowing.  Tr. 569.

On August 30, 2011, Carter-Perry returned to Dr. Misak complaining of worsening pain

in her lumbar spine and left elbow related to osteoarthritis.  Tr. 513.  Dr. Misak noted that Carter-

Perry appeared to be in pain; upon examination, she had tenderness to palpation over her left

lumbar paraspinous region with no spasm.  Tr. 513.  Dr. Misak recommended she take

gabapentin as well as her naproxen.  Tr. 513.  A treatment note from October 7, 2011, indicated

that Carter-Perry continued to have pain in multiple joints.  Tr. 594.

### C.  Medical Opinion Evidence

### 1.  Treating Physician

In July 2011, Dr. Misak completed a Medical Source Statement with respect to Carter-

Perry's physical capacity.[2]  Tr. 496-497.  Dr. Misak opined that Carter-Perry was unable to lift

more than ten pounds occasionally and five pounds frequently; could stand or walk for up to one

hour at a time for a total of two hours in an eight-hour workday; could sit up to one hour at a

time for a total of two hours in a workday; and that she could only occasionally balance due to

her osteoarthritis but that she could frequently climb, stoop, crouch, kneel and crawl.  Tr. 496.

Dr. Misak stated that she was unable to push or pull due to her asthma, could frequently reach,

and that she would have environmental restrictions such as heights, moving machinery,

temperature extremes, chemicals, dust, noise and fumes.  Tr. 497.  He wrote that she needed

---

[2]  The date on the form is illegible.

9

additional rest breaks than those provided in a regular workday and that she should have a sit/stand option.  Tr. 497.  He indicated that Carter-Perry experiences severe pain.  Tr. 497.

On August 15, 2012, Dr. Misak completed a second Medical Source Statement.  Tr. 694-695.  Dr. Misak opined that Carter-Perry could carry up to five pounds occasionally and frequently; could stand or walk a total of two hours in an eight-hour workday; could sit up to two hours at a time for a total of four hours in a workday; and could occasionally balance, reach, push, or pull.  Tr. 694-695.  She could never climb, stoop, crouch, kneel and crawl.  Tr. 695.  He again found Carter-Perry had environmental restrictions, needed a sit/stand option, and that she experiences severe pain.  Tr. 695.

### 2. Consultative Examiners

**Mental**: On December 2, 2010, Carter-Perry saw Melissa Korland, Ph.D., for a consultative examination.  Tr. 347.  Carter-Perry stated that her youngest son was murdered a few weeks prior to the exam and that she felt "tremendous grief and shock" as a result.  Tr. 347.  She acknowledged seeking psychological treatment following the death of her first husband in 1994 and that she had taken Zoloft, but that the medication did not alleviate her symptoms and she stopped taking it.  Tr. 348.   She complained of problems sleeping since the death of her son.  Tr. 350.   She stated that she felt depressed on a daily basis because of her physical health problems and reported feeling embarrassed and humiliated because she had to rely on so much assistance throughout her day.  Tr. 350.  She denied problems relating to others.  Tr. 348.  Dr. Korland noted that, despite Carter-Perry's need to adjust to her physical limitations, she is still able to perform household chores, cook for her family, exercise, and engage in social activity.  Tr. 351.

Dr. Korland observed that Carter-Perry often had poor eye contact and frequently looked at the floor while speaking, although she was fairly easy to establish a rapport with. Tr. 349. She had a mildly depressed mood. Tr. 349. Dr. Korland diagnosed her with adjustment disorder, depressed mood, chronic, and assigned a Global Assessment of Functioning (GAF) score of 60.[3] Tr. 352. She opined that Carter-Perry had a mild impairment in her ability to maintain concentration, persistence and pace to perform simple and multi-step tasks. Tr. 352. Dr. Korland explained, "[d]ue to Carter-Perry's difficulties with low mood, coupled with recent grief issues, she may find it difficult to maintain appropriate attention." Tr. 352. Dr. Korland also opined that Carter-Perry was mildly impaired in her ability to withstand the stress and pressures of day-to-day work activities. Tr. 352.

### 3. State Agency Reviewers

On December 15, 2010, Paul Tangeman, Ph.D., a state agency psychologist, reviewed Carter-Perry's file and opined that she did not have a severe mental impairment. Tr. 353. On May 17, 2011, state agency psychologist Caroline Lewin, Ph.D., affirmed Dr. Tangeman's opinion. Tr. 394.

On January 4, 2011, Willa Caldwell, M.D., a state reviewing physician, reviewed Carter-Perry's file. Tr. 367-374. Regarding Carter-Perry's physical residual functional capacity (RFC), Dr. Caldwell opined that Carter-Perry could lift and/or carry fifty pounds occasionally and twenty-five pounds frequently; stand and/or walk and sit for a total of about six hours in an eight-hour workday; had an unlimited ability to push and pull; had no postural limitations; and should avoid concentrated exposure to extreme heat and fumes, odors, dusts, gases, poor

---

[3] GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses. *See* American Psychiatric Association: Diagnostic & Statistical Manual of Mental Health Disorders, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.*

ventilation, etc.  Tr. 368, 371.  On May 16, 2011, W. Jerry McCloud, M.D., a state agency physician, reviewed Carter-Perry's file and affirmed Dr. Caldwell's assessment.  Tr. 393.

### D.  Testimonial Evidence

#### 1.  Carter-Perry's Testimony

Carter-Perry was represented by counsel and testified at the administrative hearing.  Tr. 44-70.  She testified that she completed the eleventh grade.  Tr. 44.  She last worked in June 2011 as a nurse's aide.  Tr. 56, 62.  She held that job from 2007 to 2011.  Tr. 55.  She stated that her work duties included showering, bathing, clothing, and feeding people.  Tr. 56.  She also pushed people in a wheelchair for about fifteen to twenty minutes every day and helped people walk up and down the hallway with their walkers.  Tr. 56.  She also regularly lifted patients. Tr. 56.  She stated that she was irritated by fumes at work, particularly when the facility was stripping the floors.  Tr. 57.  Chemicals irritated her as well but she was able to avoid them.  Tr. 58.

Carter-Perry testified that she worked full time during most of 2010.  Tr. 61-62.  She stated that she stopped working in March 2010 because her doctor told her that "I didn't need to be working" because of back pain.  Tr. 60-61.   She did not work for a few months but then resumed working full time, although she initially alleged an onset date of March 2010.  Tr. 61.  She agreed that she alleged that, as of March 2010, she could only stand, sit or walk for fifteen minutes.  Tr. 62.  She stated that, despite these limitations, she was still able to work full-time as a nurse's aide because her employer let her sit whenever she wanted.  Tr. 62-63.  She continued working through June 2011, although two or three of those months in 2011 were on a part-time basis.  Tr. 61-62.  She separated from her employer in June 2011 after she provided a letter from

12

Dr. Misak stating that she could no longer lift over twenty-five pounds, explaining that the union did not permit light work.  Tr. 64.

Carter-Perry testified that she is unable to work because of her current back problems and breathing problems.  Tr. 44.  She has back pain in the middle of her back down to her lumbar region.  Tr. 45.  The pain is very sharp and is so bad "it knocks me to my knees."  Tr. 45.  She feels the pain every day.  Tr. 45.  It gets worse if she tries to bend to touch her toes or if she lifts something that weighs around fifteen or twenty pounds.  Tr. 45.  It also hurts when she tries to take walks.  Tr. 45.  She eases her pain by sitting on the floor with her back against the wall.  Tr. 46.  She was in therapy for her back pain but no longer attends because it caused her pain to worsen.  Tr. 46.  She takes Naproxen and Neurontin which helps ease the pain but does not take it away.  Tr. 46.  Her pain is an eight out of ten without her medication and a six or a seven with her medication.  Tr. 46-47.  She also has a back brace that she wears every day.  Tr. 47.

Carter-Perry testified that she has breathing problems that cause her to suddenly feel like her chest wall and rib cage are closing and tightening.  Tr. 47.  Her problem is affected by hot, cold, and humid weather.  Tr. 48.  She also stated that certain odors such as cologne and cut grass and other irritants like pollen, dust, ragweed and cigarette smoke trigger her breathing problems.  Tr. 48.  She can walk up six steps before she needs to stop and take a break.  Tr. 48.  She has an oxygen machine that she got in 2005 that she uses as needed.  Tr. 48.  The oxygen machine checks her oxygen level and, if her level drops below eighty, she has to use oxygen.  Tr. 48-49.  She last had to use oxygen about two months prior to the hearing and stated that when she was first diagnosed with COPD she used it quite often but that it has gotten better with time.  Tr. 49.  She also has a nebulizer that she uses when she gets up in the morning and before she

goes to bed at night.  Tr. 49.   On several occasions she has used it more than twice a day.  Tr. 49.

Carter-Perry testified that she cooks, cleans around the house, goes grocery shopping, and reads books.  Tr. 52-53.  She is able to stand for fifteen minutes before needing to sit down due to right side back pain.  Tr. 50.  She can walk three minutes at one time and then she has to stop because she feels like everything, including her breathing, is acting up and her chest wall is closing.  Tr. 50.  She can sit for fifteen to twenty minutes and then she needs to stand.  Tr. 50. She can lift a maximum of twenty pounds every ten to fifteen minutes.  Tr. 51.

With respect to her mental health, Carter-Perry testified that she is scared that she will stop breathing and that she has dreams about her son.  Tr. 51.  She gets four hours of sleep a night even with her sleep medication.  Tr. 51.  She goes out with family and friends and has no trouble focusing on activities or tasks.  Tr. 51-52.  She has been seeing Dr. Misak since 1980 or 1989 and currently sees him every three months.  Tr. 52.  She also sees a grief counselor every Monday and Friday.  Tr. 52.

### 2. Vocational Expert's Testimony

 Vocational Expert James Breen ("VE") testified at the hearing.  Tr. 65-70, 145.  The ALJ discussed with the VE Carter-Perry's past relevant work as a nurse's assistant and work as a building maintenance laborer that she held just over fifteen years prior.  Tr. 66-67.  The ALJ asked the VE to determine whether a hypothetical individual of Carter-Perry's age, education and work experience could perform the jobs she performed in the past if that person had the following characteristics: can perform light work but cannot tolerate concentrated exposure to temperature extremes, humidity, strong odors, fumes, dust, chemicals, or other respiratory irritants.  Tr. 67-68.  The VE testified that the person could not perform Carter-Perry's past

relevant work.  Tr. 68.  The ALJ asked the VE if there were any jobs that the individual could perform and the VE answered that the individual could perform jobs as a cashier (22,000 regional jobs, 65,000 Ohio jobs, 1.15 million national jobs), fast food worker (25,000 regional jobs, 90,000 Ohio jobs, 1.5 million national jobs), and mail clerk (800 regional jobs, 3,000 Ohio jobs, 72,000 national jobs).  Tr. 68.

The ALJ asked the VE whether such an individual could perform those jobs if the individual was limited to simple, routine, and repetitive tasks.  Tr. 69.  The VE answered that such an individual could perform those jobs.  Tr. 69.  The ALJ asked the VE whether the hypothetical individual could perform any jobs if the individual was unable to engage in sustained work activity for a full eight-hour day on a regular and consistent basis.  Tr. 69.  The VE answered that there would be no jobs for such an individual.  Tr. 69.

Next, Carter-Perry's attorney asked the VE whether the hypothetical individual the ALJ first described could perform work if the individual would need at least two extra breaks lasting about ten to twenty minutes each, in addition to a fifteen-minute morning and afternoon break and a thirty-minute lunch break.  Tr. 69.  The VE answered that he would consider such a person incapable of working in full-time competitive employment.  Tr. 70.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable

to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

 In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1.     If the claimant is doing substantial gainful activity, he is not disabled.

2.     If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.     If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.     If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.     If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[4] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the

---

[4] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

Commissioner at Step Five to establish whether the claimant has the vocational factors to

perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his December 19, 2012, decision, the ALJ made the following findings:

1.      The claimant meets the insured status requirements of the Social Security
        Act through June 30, 2015.  Tr. 21.

2.      The claimant has not engaged in substantial gainful activity since June
        26, 2011, the amended alleged onset date.  Tr. 21.

3.      The claimant has the following severe impairments: chronic obstructive
        pulmonary disease and arthralgia.[5]  Tr. 22.

4.      The claimant does not have an impairment or combination of
        impairments that meets or medically equals the severity of one of the
        listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 23.

5.      The claimant has the residual functional capacity to perform light work as
        defined in 20 CFR 404.1567(b) and 416.967(b) except she must not work
        in environments with concentrated exposure to temperature extremes,
        humidity, or other respiratory irritants such as dusts, fumes, gases, odors,
        or chemicals.  Tr. 23.

6.      The claimant is unable to perform any past relevant work.  Tr. 31.

7.      The claimant was born on May 25, 1962 and was 49 years old, which is
        defined as a younger individual age 18-49, on the alleged disability onset
        date.  Tr. 31.

8.      The claimant has at least a high school education and is able to
        communicate in English.  Tr. 31.

9.      Transferability of job skills is not material to the determination of
        disability because using the Medical-Vocational Rules as a framework
        supports a finding that the claimant is "not disabled," whether or not the
        claimant has transferable job skills.  Tr. 31.

10.     Considering the claimant's age, education, work experience, and residual
        functional capacity, there are jobs that exist in significant numbers in the
        national economy that the claimant can perform.  Tr. 31.

---

[5]  Arthralgia is defined as pain in a joint.  *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 150.

11.    The claimant has not been under a disability, as defined in the Social Security Act, from June 30, 2011, through the date of this decision. Tr. 32.

## V. Parties' Arguments

Carter-Perry objects to the ALJ's decision on two grounds. She argues that the ALJ's finding in his Step Two analysis that Carter-Perry does not have a severe mental impairment is not supported by substantial evidence and that the ALJ failed to follow the treating physician rule. Doc. 15, pp. 12, 14. In response, the Commissioner submits that the ALJ did not err at Step Two and that he properly evaluated the medical opinion evidence. Doc. 16, pp. 11-12.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health and Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A. The ALJ did not err at Step Two

Carter-Perry argues that the ALJ's finding that her adjustment disorder was not a severe impairment is not supported by substantial evidence. Doc. 15, p. 12. According to Carter-Perry,

the evidence shows that her mental impairment is severe and has more than a minimal effect on her ability to perform basic work activities such as maintaining attention and concentration, persistence and pace to perform even simple tasks and withstanding the stress and pressures associated with day-to-day work activities.  Doc. 15, pp. 13-14.  In support of her argument, Carter-Perry relies on consultative examiner Dr. Korland's opinion that she has mild restrictions in her ability to maintain attention, concentration, persistence and pace to perform simple tasks and withstand the stress and pressures associated with day-to-day work activities in addition to Carter-Perry's own reports of depression, grief related-symptoms, and difficulty sleeping.  Doc. 15, p. 13.

At Step Two, the Commissioner must consider whether a claimant has a severe impairment.  *See* 20 C.F.R. §§ 404.1520(a)(4)(ii).  A claimant carries the burden of proving the severity of her impairments.  *Allen v. Apfel*, 3 Fed. App'x 254, 256 (6th Cir. 2001) (citing *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988)).  Step Two of the sequential evaluation has been construed as a *de minimis* hurdle for a claimant to meet.  *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1985).  If a "claimant's degree of [mental] limitation is none or mild, the Commissioner will generally conclude the impairment is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in" a claimant's "ability to do basic work activities." *Griffeth v. Comm's of Soc. Sec.*, 217 Fed. App'x 425, 428 (6th Cir. 2007) (quoting 20 C.F.R. § 404.1520a(d) (internal quotations omitted)).  The purpose of Step Two is to allow the Commissioner the ability "to screen out 'totally groundless claims'" from a medical standpoint. *Id.* (citing *Farris v. Sec'y of HHS*, 773 F.2d 85, 89 (6th Cir. 1985).  Thus, a claimant's impairment will be construed as non-severe only when it is a "slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's

ability to work irrespective of age, education and work experience." *Farris*, 773 F.2d at 90

(citing *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)).

In this case, the ALJ concluded that Carter-Perry's adjustment disorder did not have more

than a minimal effect on her ability to perform work-related activities. Tr. 22.   The ALJ

explained that the record demonstrated that Carter-Perry had little treatment apart from

intermittent medication for her symptoms; that her symptoms were mainly precipitated by her

bereavement with respect to the deaths of her father and her son; and that there was no evidence

to suggest that her symptoms cause limitations in her activities of daily living, social functioning,

or concentration, persistence, and pace.  Tr. 23.  The ALJ discussed Dr. Misak's treatment

records, beginning with the Sertraline prescription following the death of Carter-Perry's father

and that the following month Carter-Perry reported feeling less sad, appeared cheerful, and had

stopped taking the Sertraline.  Tr. 22.   The ALJ considered Dr. Korland's consultative

examination and Dr. Korland's assessment that Carter-Perry was no more than mildly impaired

in her psychological ability to perform work-related tasks, commenting that Dr. Korland based

her opinions mainly on Carter-Perry's grief issues.  Tr. 22.  He noted that Dr. Korland assessed a

GAF score of 60 and that the state agency physician found that Carter-Perry's psychological

symptoms are non-severe.  Tr. 22; *see* Social Security Ruling 96-6p (state reviewing

psychologists are experts in evaluating medical issues pertaining to social security disability).

Accordingly, the ALJ's finding that Carter-Perry's adjustment disorder was not severe was

supported by substantial evidence and must be affirmed.  *See Griffeth*, 217 Fed. App'x at 428

(the ALJ will generally conclude that a claimant's impairment is not severe when there is no

more than a minimal limitation in the claimant's ability to do basic work activities); *Jones v.*

*Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) (the Commissioner's decision is upheld

so long as substantial evidence supports the ALJ's conclusion).

Furthermore, in Step Two, the ALJ concluded that Carter-Perry had the following severe impairments: chronic obstructive pulmonary disease and arthralgia.  Tr. 22.  The ALJ continued on through the sequential steps and considered all alleged impairments.  Tr. 22-31.  Thus, the ALJ's failure to find that Carter-Perry's adjustment disorder was non-severe is not reversible error.  *See Maziarz v. Sec'y of HHS*, 837 F.2d 240, 244 (6th Cir. 1987) (when severe impairments are found at Step Two and the ALJ continues with the sequential steps in the disability determination and considers all impairments, a failure of the ALJ to find a particular condition as non-severe is not reversible error); *Riepen v. Comm'r of Soc. Sec.*, 198 Fed. App'x 414, 415 (6th Cir. 1006).

### B.  The ALJ did not err with respect to the treating physician rule

Carter-Perry argues that the ALJ improperly applied the treating physician rule with respect to the opinion of Dr. Misak, her family physician.  Doc. 15, p. 14.  Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record."  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(c)(2).  If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *Wilson*, 378 F.3d at 544.  In deciding the weight given, the ALJ must consider factors such as the length, nature, and extent of the treatment relationship; specialization of the physician; the supportability of the opinion; and

the consistency of the opinion with the record as a whole.  *See* 20 C.F.R. § 416.927(a)-(d);

*Bowen v. Comm'r of Soc Sec*., 478 F.3d 742, 747 (6th Cir. 2007).

Here, the ALJ did not err in assigning weight to Dr. Misak's opinion. Dr. Misak opined

that Carter-Perry was limited in her ability to sit, stand and walk and that she had postural

limitations because of her osteoarthritis. Tr. 29, 496. Dr. Misak opined that Carter-Perry was

limited in her ability to push or pull because of her asthma. Tr. 29, 497. With respect to Dr.

Misak's opinion, the ALJ stated,

> The opinions of Dr. Misak are given weight only to the extent they find the claimant
> capable of performing work-related tasks, however, he overstates the claimant's
> limitations in light of her recent work activity, pulmonary function testing, her stable
> asthma/COPD condition, and lack of orthopedic findings to explain her pain complaints.

Tr. 31.

In his decision, the ALJ previously detailed the clinical evidence found in Carter-Perry's

pulmonary function testing. He noted that Carter-Perry underwent pulmonary function testing in

September 2009 and that the test indicated that she had a moderate obstructive ventilatory

impairment that did not respond significantly to bronchodilator therapy. Tr. 25. He referenced

Carter-Perry's second pulmonary function test in February 2011 that resulted in a diagnosis of a

mild, fully reversible obstructive ventilator impairment. Tr. 28. The ALJ observed that the

pulmonologist's impression noted in the second test results found no significant change in

Carter-Perry's condition since the 2009 test. Tr. 28.

The ALJ observed that, in an exercise oximetry study in October 2011, Carter-Perry was

able to walk 1,274 feet at a normal pace while breathing room air and that her oxygen

desaturation fell from 98% to 95%, which was interpreted to show no worrisome oxygen

desaturation and that supplemental oxygen was not recommended. Tr. 27-28. The ALJ

commented that, in an oximetry study performed in February 2011, Carter-Perry was able to walk 1,300 feet at a normal pace with a consistent 98% oxygen saturation while breathing room air and participated in a nocturnal pulse oximetry study that showed no episodic desaturations. Tr. 28.

With respect to Carter-Perry's back problems, the ALJ referenced a 2007 MRI study that indicated moderate lumbar facet disease without significant foraminal or canal narrowing.  Tr. 27.  As the ALJ observed, the record contains no additional objective evidence regarding Carter-Perry's back problems.  Tr. 31.

The ALJ also discussed substantial evidence in the record that was inconsistent with Dr. Misak's opinion.  Specifically, the ALJ pointed out that Dr. Misak and treating pulmonologists described Carter-Perry's asthma and COPD symptoms as stable with the use of her medication. Tr. 25 (referencing Pulmonologist Infield's statement that Carter-Perry's asthma is well-controlled on medications; Dr. Misak's statement in September 2009 that her asthma was stable); Tr. 26 (Dr. Misak's finding in January 2010 that her asthma and COPD was controlled on medications; Pulmonologist Khanna's April 2010 notes that she had been doing fine); Tr. 27 (Pulmonologist Kandasamy's finding in July 2010 that her condition was well-controlled on current treatment regime; Pulmonologist Golish observing that Carter-Perry's recent COPD exacerbation responded well to treatment); Tr. 28 (Dr. Misak's January 2011 treatment notes stating that her asthma symptoms were stable on her medication; Drs. Kandasamy and Misak recommending in April 2011 that she continue her medications and be re-evaluated in one year); Tr. 29 (Dr. Misak's October 2011 and January 2012 treatment notes finding her asthma and COPD symptoms stable; Pulmonologists Krishnan's and Kandasamy's finding in May 2012 that her asthma and COPD symptoms were stable with no progression; Dr. Misak's May and August

2012 treatment notes observing that her condition remained stable).  The ALJ also discussed Carter-Perry's reports of back and shoulder pain and that Dr. Misak also found this condition stable with medication.  Tr. 29.  The ALJ explained that the evidence suggests that Carter-Perry's symptoms are well-controlled on her current treatment regime and that, if she avoids her asthma triggers and remains compliant with medications, she can perform light work with no exposure to respiratory irritants.  Tr. 30.  Accordingly, the ALJ followed the guidelines and did not err in giving Dr. Misak's opinion less than controlling weight.  *See Wilson*, 378 F.3d at 544; 20 C.F.R. § 404.927(c)(2).

In considering the evidence of record, the ALJ referenced numerous treatment notes from Dr. Misak beginning in September 2009 through August 2012, as described above.  Tr. 25-30.  Thus, the ALJ did not "ignore[] the longstanding and consistent treatment that Dr. Misak provided," as Carter-Perry alleges.  Doc. 15, p. 17.  Moreover, the ALJ repeatedly referenced the copious treatment notes of pulmonologists and identified Dr. Misak as an internist.  Tr. 25.  *See* 20 C.F.R. § 416.927(c)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.").

The ALJ further explained that inconsistencies in the record as a whole undermined work-related restrictions in addition to those contained in the RFC.  Tr. 30.  Specifically, the ALJ cited Carter-Perry's questionnaire filled out in August 2010 in which she stated that she experienced shortness of breath 20-22 hours every day despite her medication and that dressing and getting out of bed caused shortness of breath and pain.  Tr. 24.  The ALJ referenced Carter-Perry's February 2011 report in which she stated that she cannot walk, sit on the toilet, dress or put on shoes, feed herself or brush her teeth.  Tr. 24.  The ALJ noted that Carter-Perry testified at

the hearing that she could only walk up six steps without shortness of breath.  Tr. 24.  Contrary to these statements, the ALJ observed that treatment notes show that Carter-Perry regularly denied shortness of breath or chest pain; that treatment notes show that she had good breath sounds; that her breathing problems were exacerbated by cold weather and that she was able to control her cold weather symptoms by using a mask when exposed; and that her symptoms were controlled on medication and by avoiding her asthma triggers.  Tr. 25-28, 30.  The ALJ noted that Carter-Perry continued to smoke cigarettes despite stating that she had stopped smoking.  Tr. 26-29.  The ALJ commented that Dr. Krishnan observed that Carter-Perry remained active in May 2012 and that she reported to Dr. Korland in December 2010 that, prior to her son's murder the previous month, she would perform morning exercises, walk to a nearby recreation center to walk on the track; and would ride her bicycle in the neighborhood in good weather.  Tr. 28.  She reported that she cooked often, had no problems with household chores, hygiene, or shopping and running errands.  Tr. 28.  Finally, the ALJ observed that Carter-Perry last worked in June 2011 and that she was performing medium work activity for one year after her initial alleged onset date on her fourth application for disability benefits and that, following her last day of work, Carter-Perry filed for and received unemployment benefits which require a recipient to agree to return to work if it is available.  Tr. 30.

In sum, the ALJ described why he did not give controlling weight to Dr. Misak's opinion and provided good reasons for the weight he gave to the opinion such that the Court is able to conduct a meaningful review.  *See Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 377 (6th Cir. 2013) (without good reasons, a court cannot conduct a meaningful review); *Wilson*, 378 F.3d at 544; 20 C.F.R. § 416.927(c).

### VII. Conclusion

For the reasons set forth herein, the Commissioner's decision is **AFFIRMED.**

Dated: March 5, 2015

Kathleen B. Burke
United States Magistrate Judge